IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America,

Plaintiff,

v.

Adam King,

Defendant

24CR153

## MOTION FOR PRETRIAL RELEASE FROM CUSTODY

Now comes the Defendant, Adam King, by and through his attorney Dena M. Singer and Jonathan S. Bedi, of Bedi & Singer, LLP, and pursuant to 18 U.S.C. § 3142 moves the Court to set conditions for pretrial release. Mr. King rebuts any presumption of detention under 18 U.S.C. § 3142(e)(3)(E) with evidence of his family ties, employment history, lack of criminal history, lack of non-appearance history, and lack of drug or alcohol abuse. Moreover, the Government will fail to carry its burden by clear and convincing evidence that no release conditions could reasonably assure the safety of the community. In support of this Motion, Adam states as follows:

Adam is 39 years old. He grew up in Evansville, Indiana in addition to Newberg and Booneville, Indiana. Adam has no criminal background. Adam received his Bachelor of Science degree from Purdue University in Animal Science. Adam continued his education, earning his Doctor of Veterinary Medicine degree at North Carolina State

1

University's College of Veterinary Medicine. Adam is a board-certified veterinarian ophthalmologist. He is licensed in several states, including but not limited to IL, IN, OH, MI, WI, NC, FL, RI, and OK. Around 2015 Adam moved to the Chicagoland Area. He began working in the Chicago area suburbs from 2015 to 2019. Adam is now employed at MedVet Chicago. He is the Ophthalmology specialty leader for all MedVet locations. Adam does not have to travel for work and he always works out of the same location. Adam is the sole breadwinner for his family, as his husband, Lucas, does not work outside of the home.

In 2016 Adam married Lucas King. Adam and Lucas moved to Elburn, IL and have lived at their residence for the past 6-7 years, which they own. Adam and Lucas also own property in Batavia, Illinois which they bought in 2020/2021. Adam and Lucas live in Elburn with their 9 dogs. There are no weapons of any kind that they own or that are in the home. No one else lives in the house. However, as this court is aware, Adam and Lucas are welcoming their first child, who is being born through surrogacy this upcoming week. The child is Adam and Lucas' biological child. Adam and Lucas were planning on being there for their child's birth this week in Sacramento, California.

Adam has strong ties to the area. Besides Lucas, Adam's parents are still residing in Boonville, Indiana and Lucas' parents live approximately 30 minutes away from their home in Elburn. Adam and Lucas are incredibly close to both sets of parents and speak to them daily. Adam and Lucas' parents are extremely supportive and will assist them in any way they can. Adam does have a passport, which upon release, he is willing to surrender, and he has had the fortunate ability to travel for work and socially, and he always returns back to the area where he is from. As discussed more fully below, the

2

defense proposes to this court that conditions of release would include Adam's parents moving into Adam's home and acting as third-party custodian. In addition, if the court finds it necessary, a secured bond can be posted.

On March 5, 2024 federal agents executed a search warrant at his home - he was not arrested. After the government went overt, Adam did not flee. The plane ticket to California to witness the birth of his child was purchased and planned long before.[1]

Adam has no physical or mental health issues, nor does Adam have any addiction issues. Recently, Adam was evaluated by a Forensic Psychologist and, in an oral report to the undersigned counsel, found that "Adam is low risk for sexually victimizing people." Adam has no criminal history, has never been arrested, and therefore has no failures to appear.

MEMORANDUM AND POINTS OF AUTHORITY

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Under § 3142(b) the court "shall order the pretrial release of the person on personal recognizance … unless" there are absolutely no conditions of release which would reasonably assure (1) the client will return to court or (2) the client will not pose a danger to the community.  18 U.S.C. § 3142(b). Pretrial detention should be the exception, not the norm.

This court should release Adam for the following reasons: (1) the statutory presumption of detention should be viewed with extreme caution because it leads to

---

[1] The only reason there was no return flight was because their child could not fly home until 7 days old and therefore they did not know when they should book the return flight. However, evidence in the complaint supports the defense position that they were returning to the Chicago area with the newborn child.

3

high rates of detention for low-risk defendants like Adam; (2) Adam has rebutted the presumption of detention based on his family ties, employment status, and lack of criminal history, (3) there are conditions that will reasonably assure the safety of the community.

### 1. The statutory presumption of detention should be viewed with extreme caution because it leads to high rates of detention for low-risk defendants like Adam

This court must view the rebuttable presumption with extreme caution. Congress enacted the statutory presumptions of detention in the BRA to detain the most dangerous offenders who pose a significant risk to the community if released.[2] *See United States v. Salerno*, 481 U.S. 739, 747 (1987) ("The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes"). However, the presumption of detention has not worked as intended. Federal pretrial detention rates have skyrocketed since the BRA was enacted, rising from 19% in 1985 to 75% in 2019.[3] A recent study by the Administrative Office of the Courts (AO) attributed this "massive increase" in detention rates to the presumption of detention, especially when applied to low-risk defendants like Adam.[4]

The study further found the presumptions increase detention rates without advancing community safety. Rather than jailing the worst offenders, the presumption over-incarcerates low-risk offenders, specifically those who are stable, employed,

---

[2] Amaryllis Austin, The Presumption for Detention Statute's Relationship to Release Rates, 81 FED. PROB. 52, 56–57 (2017), archived at https://perma.cc/9HGU-MN2B

[3] Pretrial Release and Detention: The Bail Reform Act of 1984, Bureau of Just. Stat. Special Rep., at 2 (Feb. 1988), https://www.bjs.gov/content/pub/pdf/prd-bra84.pdf (Table 1) (18.8% of defendants detained pretrial in 1985); Judicial Business: Federal Pretrial Services Tables, Admin. Off. U.S. Courts ("AO Table"), Table H-14 (Sept. 30, 2019) https://www.uscourts.gov/sites/default/files/data_tables/jb_h14_0930.2019.pdf (74.8% of defendants detained pretrial in 2019).

[4] Austin, *supra* note 2, at 57, 61

educated, and have minimal criminal history such as Mr. King.[5] When low-risk individuals are not facing a presumption of detention, they are released 94% of the time.[6] Yet, when low-risk individuals are facing a presumption, they are released just 68% of the time.[7] Recent testimony before Congress relied on this study to call for reform: "These presumptions must be changed because they've had far-reaching and devastating consequences that were unforeseen and unintended by Congress." [8]

High federal pretrial detention rates have significant and wide-ranging social and economic costs.[9] For example, the study explains defendants who remain in custody risk a loss of employment, housing, community ties, and ultimately pushes defendants toward new criminal activity.[10] It is unsurprising then that another AO study found a relationship between pretrial detention of low-risk defendants and an increase in their recidivism rates, "both during the pretrial phase as well as in the years following case disposition."[11] Federal pretrial detention is also associated with increases in the imposition of a prison sentence and increases in sentence length, even after controlling

---

[5] *See id.* at 57.

[6] *Id.*

[7] *Id.*

[8] *See* The Administration of Bail by State and Federal Courts: A Call for Reform: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. (2019), https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=2256; Testimony of Alison Siegler at PDF 6–7 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-TTF-SieglerA- 20191114.pdf

[9] Austin, *supra* note 2, at 61.

[10] *Id.* at 53; *see also* Alexander M. Holsinger & Kristi Holsinger, Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes, 82(2) Fed. Prob. 39, 42 (2018), archived at https://perma.cc/LQ2M-PL83 (finding that for people detained pretrial for at least three days, 76.1% had a negative job-related consequence and 37.2% had an increase in residential instability).

[11] Austin, *supra* note 2, at 54 (citing Christopher T. Lowenkamp et al., Investigating the Impact of Pretrial Detention on Sentencing Outcomes (The Laura and John Arthur Foundation 2013), archived at https://perma.cc/8RPX-YQ78).

for criminal history, offense severity, and socio-economic variables.[12] These stark statistics must be considered in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release.[13] In other words, pretrial detention imposes enormous costs on defendants, their loved ones, and the community, in a counterproductive attempt to prevent crimes that are extremely unlikely to occur in the first place.

Finally, there are significant fiscal costs associated with high federal pretrial detention rates. As of 2016, the average pretrial detention period was 255 days (although several districts averaged over 400 days in pretrial detention).[14] Because of the significant costs and clear lack of benefits, this Court should vacate the pretrial detention order because Adam is a low-risk defendant.

### 2. Adam has rebutted the presumption of detention

"[T]he burden of production" to rebut the presumption "is not a heavy one to meet." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (emphasis added). The presumption can be rebutted by "[a]ny evidence favorable to a defendant that comes within a category listed in § 3142(g) . . . , including evidence of their marital, family and employment status, ties to and role in the community, clean criminal record and other types of evidence encompassed in 3142(g)(3)." *Id.* at 707 (emphasis added). Indeed, as long as a defendant "come[s] forward with some evidence" pursuant to § 3142(g), the presumption of flight and dangerousness is definitively rebutted. *Id.* Additionally, even

---

[12] James C. Oleson et al., The Sentencing Consequences of Federal Pretrial Supervision, 63 Crime & Delinquency 313, 325 (2014), archived at https://perma.cc/QAW9-PYYV.

[13] Thomas H. Cohen et al., Revalidating the Federal Pretrial Risk Assessment Instrument: A Research Summary, 82(2) Fed. Prob. 23, 26 (2018), archived at https://perma.cc/8VM9-JH9T.

[14] Austin, *supra* note 2, at 53.

when there is a presumption of detention, the defendant never bears the burden to prove he is not a danger or a flight risk. The burden of proof still rests with the government at all times. *United States v. Jessup*, 757 F.2d 378, 386 (1st Cir. 1985) ("the presumption does not shift the burden of persuasion.").

Adam's ties to the community, his supportive family, lack of criminal background, steady employment, and availability of a third-party custodian, as described above, all support that Adam has rebutted the presumption of detention in this case.

### 3. Adam proposes conditions of release that would ensure his appearance and which would reasonably assure the safety of the community

Adam must be released because there are conditions that will reasonably assure the safety of the community. A defendant cannot be detained unless a finding is made that *no* release conditions will reasonably assure the safety of the community. *Dominguez*, 783 F.2d at 707 (quoting § 3142(e)). The government will clearly focus on the allegations contained in the complaint. In considering any government proffer, the court should give this minimal consideration. First, courts are prohibited from placing too much emphasis on the weight of the evidence because it is akin to applying a presumption of guilt, which is forbidden under § 3142(j). Moreover, courts have determined the weight of the evidence should be the least important factor in a court's analysis. *See United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990) ("The weight of the evidence against the defendant is a factor to be considered but it is the least important of the various factors.") (internal quotations omitted). Second, a defendant need not demonstrate the nature of his crime is not dangerous to the community. *See*

7

*Dominguez*, 783 F.2d at 706. Instead, the court must analyze the defendant's individual characteristics under § 3142(g). Here, as discussed above, Adam has significant family support, no criminal history, and ties to the community. His personal characteristics show he is not a danger to the community.

The conditions the court could put in place are the following:

1. Lucas will move out of the family house, while waiting for the birth of their son,

2. Lucas will move in with his parents, while Adam will stay at the family home

3. Adam's parents, Kirby and Tina King, will act as third-party custodians, and they will live in the house and monitor Adam and report any violation to the court and pretrial,

4. Adam will have no contact with the infant unless authorized by this Court

5. Adam will have no contact with anyone under the age of 18 years old

6. The internet at the house will be disabled

7. He will be prohibited from accessing any internet-capable device

8. Surrender of Adam's passport and limit or prevent travel without prior authorization from this Court;

9. The court will place Adam on location monitoring;

10. The home has a Ring Camera, which Adam and Lucas can provide probation access so that pretrial can monitor who is coming and going

11. Permit the supervising officer to make unannounced inspections of the

defendant's residence or place of residence for the purpose of ensuring compliance with the conditions of pretrial release

As this court is aware, "Section 3142 does not seek ironclad guarantees," but instead only requires reasonable assurance. *See United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal.1992). As in every case, there is *some* remote risk a defendant will commit a new crime while on bond. However, the risk is extremely low, both generally and in this case. Generally, in 2019, 98% of released federal defendants did not commit new crimes while on bond.[15] So any argument by the government that there is a remote possibility that Adam accesses the internet cannot be the sole basis for his detention.

### 4. The defense has proposed conditions of release that will reasonably assure the safety of the community

Adam's case is similar to *United States v. Monfre*, No. 09-CR-30075, 2009 WL 2031829, at *1 (S.D. Ill. July 10, 2009), and shows there are conditions of release that can reasonably assure safety. In 2009, a grand jury in the Southern District of Illinois indicted Monfre with receipt of child pornography, transportation of child pornography, and criminal forfeiture. *Id.* The Government moved to detain Defendant, but Magistrate Judge Wilkerson denied the motion and released the Defendant with conditions. *Id.* The Government moved to revoke the magistrate judge's order granting pretrial release. *Id.*

In that case, the parties agreed the Defendant was not a flight risk. *Id.* Thus, the district court was called upon to determine whether, by clear and convincing evidence, there were any conditions or combination of conditions that would reasonably assure

---

[15] App. 1, AO Table H-15 (Dec. 31, 2019), available at Mot. for Bond, United States v. Rodriguez, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%).

the safety of the community if Monfre was released on bond. *Id.* The evidence in the case involved chats and around twenty-five images. *Id.* at *3. Some of the language in the chats gave the court great pause because they seemed to indicate a past child molestation and present intention to commit a future offense. *Id.*

However, the factors relevant to the Defendant's history and characteristics weighed heavily in favor of release. Defendant was 29 years old and maintained a lifelong residency in Illinois, where his parents and brother also lived. *Id.* The court stated the Defendant's family was very supportive, and he was in a committed relationship. *Id.* The Defendant had no criminal record, a full-time job, no substance abuse history, and no mental health concerns that would affect his appearance. *Id.* He also began attending Sexual Compulsives Anonymous support group meetings 14 months before the detention hearing. *Id.* In addition, his internet service at home was disconnected, and a telephone line was installed for the electronic monitoring connection. *Id.*

The probation department recommended release with conditions. *Id.* Magistrate Judge Wilkerson ordered release with conditions, imposing electronic monitoring and permitted the Defendant to go only to work, church, and doctor's appointments. *Id.* at *2. The Government argued before the district court that electronic monitoring would not alleviate the potential risk posed by the Defendant. *Id.* at *4. The Government was concerned because Monfre lived near a skating rink and a high school. *Id.* The district court also knew there was a grade school within a mile. *Id.*

Nonetheless, the district court found these concerns could be allayed with electronic monitoring and stringent curfews. *Id.* A GPS-based monitoring system would

10

tell the court where the Defendant was at all times. *Id.* Probation would monitor the course the Defendant traveled to and from work. *Id.* If he strayed or entered an exclusion zone, probation would be notified and so would the court. *Id.* If he left his home at an unapproved time by probation, it would be notified and so would the court. *Id.* In essence, the district court concluded it could assure safety if the Defendant was confined to his home, without internet access, and subject to random and unannounced searches.

Here, the Court can create similar release conditions for Adam to ensure safety. The Court can limit Adam's movements through GPS tracking, order that he remains off the internet/internet be disabled, or order that the password-protected system remains in place, designate Adam's parents as the third-party custodians, order Adam weekly therapy sessions, ensure Adam turns over his passport, and limit or prevent contact with the infant child if the court thinks it is necessary. Because these conditions will reasonably assure the safety of the community, Adam must be released.

WHEREFORE, Adam prays this Court orders release and imposes any conditions the Court believes necessary for his release.

Respectfully Submitted,

By: s/ Jonathan S. Bedi

Dena M. Singer
Jonathan S. Bedi
Bedi & Singer, LLP
53 West Jackson Blvd, Suite 1101
Chicago, IL 60604
Phone: (312) 525-2017
jbedi@bedisinger.com
dsinger@bedisinger.com
**Attorneys for Defendant**

11

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that a copy of the foregoing document was filed and served on all attorneys of record via the Court's ECF system on today's date.

<u>s/Jonathan S. Bedi</u>
Attorney for Defendant
Jonathan S. Bedi
Bedi & Singer, LLP
53 West Jackson #1101
Chicago, IL 60604
(p)312-525-2017
(f) 312-525-2107
jbedi@bedisinger.com

12